**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>*1617 JFK Blvd, Suite 520*<br>*Philadelphia, PA 19103*<br>**Plaintiff,**<br><br>**v.**<br><br>**ADAM B. RUNDLE,**<br>*14 Henry Street*<br>*Makhanda*<br>*Eastern Cape*<br>*6139*<br>*South Africa*<br>**Defendant.** | **CIVIL ACTION NO.** 26-cv-3590<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files this Complaint against Adam B. Rundle ("Rundle" or "Defendant"), and alleges as follows:

## SUMMARY

1. From at least November 2021 to January 2024 (the "Relevant Time"), Rundle executed a fraudulent investment scheme that raised $1.5 million dollars from one investor (the "Investor") by stealing the identity of a licensed securities professional ("Wealth Advisor") associated with an asset management firm registered as a broker-dealer and an investment adviser (the "Firm"). Rundle's scheme involved a fraudulent offering of a security in the form of a purported Simple Agreement for Future Equity ("SAFE") in Robinvest LLC ("Robinvest"), a company Rundle created and controlled.

2. Rundle falsely represented to the Investor that she would be purchasing a SAFE that falsely guaranteed her principal investment and a return of 4% compounded annually at the conclusion of a two-year term. As part of the scheme, Rundle stole the identity of Wealth Advisor and created fake email accounts in the name of Wealth Advisor as well as a fictional

assistant. Rundle then used those email addresses to send the Investor fabricated documents, including the SAFE agreement, an Investment Prospectus, and – after she sent money to him as an investment – monthly account statements that showed manufactured performance returns.

3. In reality, Rundle was not licensed in the securities industry or affiliated with any registered investment adviser or registered broker-dealer, and he did not invest the Investor's money on her behalf. Instead, Rundle misappropriated the $1.5 million Investor invested in Robinvest and used it for unauthorized purposes, including transfers to his personal Crypto trading account, payments on his business and personal credit cards, payroll expenses, and repayments on a business loan. By June of 2022, only $500 remained in the Robinvest bank account.

4. In June of 2023, Rundle sold his home in Annapolis, Maryland, and relocated to South Africa. Between June and August of 2023, Rundle sent his former business partners an email, a text message, and a voice note detailing his fraudulent conduct. Investor was never repaid the principal amount that she invested in Robinvest and did not receive her promised returns.

5. By engaging in the conduct described herein, Defendant violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(a)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this action pursuant to Sections

20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; Sections 21(d), (e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e) and 78aa]; and 28 U.S.C. § 1331.

7. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that Defendant registered Robinvest in the state of Maryland and utilized his home address in Annapolis, Maryland, as the address for Robinvest business bank account and Robinvest's principal place of business.

8. In connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, singly or in concert with others, has made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange– namely, through Defendant's use of the Internet when engaging in the acts and transactions described herein.

## DEFENDANT

9. **Rundle**, age 37, is currently believed to reside in South Africa. From the initiation of the fraud scheme in November of 2021 until in or about of June of 2023, Rundle resided in Annapolis, Maryland. He was the founder and CEO of CleverProfits LLC ("CleverProfits")), an online provider of payroll processing, financial reporting, bookkeeping and CFO type services. In November of 2021, Rundle registered Robinvest in the state of Maryland. Rundle has never been associated with a registered entity in any capacity and has no disciplinary history with the Commission.

## RELATED ENTITIES AND INDIVIDUAL

10. **Robinvest** was a limited liability company that purported to be an investment fund which Rundle registered in Maryland with the Department of Assessments and Taxation in November 2021. Robinvest's principal place of business was listed as Rundle's former home address in Annapolis, Maryland. Rundle was listed as the Resident Agent of the entity. On October 1, 2024, the State of Maryland placed Robinvest in forfeiture status, and therefore it no longer has the right to conduct business in the state. Robinvest has never been registered with the Commission in any capacity.

11. **[Wealth Advisor] Partners, LP** is a fictious entity fabricated by Rundle in and around 2021. Rundle utilized the name of this entity to create fraudulent email accounts with the domain name @[Wealth Advisor]partners.com. It is not registered in any state or federal agency, including the Commission.

12. **Wealth Advisor** is a resident of Annapolis, Maryland, whom Rundle knew. Rundle stole this individual's identity and used it in furtherance of his scheme. Wealth Advisor is a registered representative and a registered investment adviser representative who holds Series 6,7, 63, and 66 licenses, and has no prior disciplinary history with the Commission.

## FACTS

### I. Background

#### A. Formation of Robinvest and Creation of Accounts

13. On November 25, 2021, Rundle created two email accounts with an internet service provider—one in the name of Wealth Advisor, a registered investment adviser representative and registered representative whom Rundle knew, and a second using the name

"Sue Anderson," a fictitious identity Rundle created and controlled that purported to be the assistant of Wealth Advisor.

14. Rundle used the name of Wealth Advisor he had misappropriated to create [Wealth Advisor] Partners, LP, a fictitious entity that he styled as a limited partnership, and used the email addresses of Wealth Advisor and "Sue Anderson," both of which he controlled, to communicate in an effort to provide the appearance of a legitimate registered investment adviser representative and registered representative.

15. Also on November 25, 2021, Rundle filed Articles of Incorporation for Robinvest, a purported investment fund, with the Maryland Department of Assessments and Taxation. The paperwork listed Rundle's home address in Annapolis as Robinvest's principal place of business.

16. On December 16, 2021, Rundle opened a business checking account for Robinvest at Bank using his home address in Annapolis, Maryland, and designated himself as the sole authorized user. Other than obtaining money from Investor for the personal benefit of Rundle, Robinvest does not appear to have engaged in any business activity (including as an investment fund).

## II. Rundle Obtained Investor Funds Using a Stolen Identity and by Making Material Misstatements

### A. Rundle Provided Investor Assistance with Obtaining a $1.7 Million Loan From the Federal Government to Fund his Scheme

17. Rundle encouraged Investor, who was a customer of CleverProfits, to apply for a COVID-19 Economic Injury Disaster Loan (EIDL) administered by the Small Business Administration (SBA) by stating that the government was "giving away money" and the "loans were easy to get." Investor applied for, and received, a total of $2 million in funds through SBA's EIDL program.

18. In or around December of 2021, Rundle emphasized to Investor that he was recommending that all his customers invest a portion of the loan in a conservative investment fund called Robinvest. Rundle described Robinvest as a safe place to invest money and secure conservative growth. He stated that it was a good financial decision and a "no-brainer." Rundle did not tell Investor that he owned and controlled Robinvest.

19. In late 2021, Rundle assisted Investor with applying for, and obtaining, the final $1.7 million loan Investor received through the EIDL program to provide the capital for the Robinvest investment. Investor's business bank account received the funds from the SBA on January 10, 2022.

B. Impersonating a Licensed Securities Professional and an Imaginary Assistant

20. On December 22, 2021, Rundle sent an introductory email from his CleverProfits email account to the email account he created and controlled for "Sue Anderson," and copied Investor, as well as the email account Rundle created and controlled for Wealth Advisor. In the email, Rundle wrote:

> Hi Sue
>
> I have CC'd [Investor] into this email, she runs a business … and is likely to get a large SBA loan. She is interested in the Robinvest fund.
>
> I know [Wealth Advisor] is out, but hoping you can help.

21. Shortly after sending this introductory email, Rundle posed as "Sue Anderson" and emailed Investor:

> Hello [Investor]
> Glad to hear that you are interested in the Robinvest Fund.
> Do you need further information? Or, would you like me to send you a contract
> and the payment information?

22. On December 31, 2021, after receiving no reply, Rundle emailed Investor again posing as Sue Anderson: "Just following up here? I have added the fund prospectus and the MSCI Index details should you wish to review those." Rundle attached documents he had fabricated, including the Investment Prospectus.

23. In the Investment Prospectus, Rundle wrote that Robinvest would invest available funds alongside a registered broker-dealer and registered investment adviser, i.e., the Firm, in a specified Index Fund based on the MSCI USA Index (the "Fund"). The Investment Prospectus claimed that the Fund was invested in three sectors: technology, consumer discretionary, and health care, with its top holdings being Apple, Microsoft Corp, Amazon, and Tesla.

24. The Investment Prospectus further stated:

> Given the overall performance, risk and exposure characteristics of the MSCI USA Index. The allocation of $450 Million by [the Firm] into [the Fund] and the guaranteed 4% return to Robinvest investments. Robinvest believes this fund offers the lowest risk and exposure profile, while maximizing the potential return to investors. Therefore all available assets held by Robinvest will be directly invested into the fund for the fixed term ending December 31, 2023.

25. The Fund described in the Investment Prospectus did not exist.

26. The Firm had no relationship whatsoever with Robinvest or Rundle.

27. Rundle also sent Investor the SAFE using DocuSign via the Wealth Advisor email account. The SAFE stated that in exchange for an investment of $1.5 million, Investor would receive her initial investment amount, plus a guaranteed return of 4% (compounded annually), less fees, upon the termination of the agreement on January 13, 2024.

28. In addition, the SAFE stated that: i) the funds would be invested according to the Investment Prospectus; ii) returns earned on the investments would be distributed at the termination of the agreement; and iii) there would be a management fee of 10% of all returns

earned on the investments held by Robinvest. The SAFE listed an automatic termination date of January 13, 2024.

29. Under the heading "Events," the SAFE listed three events, and detailed what would happen to the SAFE and/or investors' funds if these events occurred. First, the SAFE indicated, "If there is Equity Financing before the termination of this Safe, …, this Safe will automatically convert into" either shares of "Standard Preferred Stock" or shares of "Safe Preferred Stock" according to a described formula.

30. Second, the SAFE noted, "If there is a Liquidity Event before termination of this Safe, this Safe will automatically be entitled … to receive a portion of Proceeds, … equal to the greater of (i) the Purchase Amount (the 'Cash-Out Amount' or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the 'Conversion Amount')."

31. And third, the SAFE noted, "If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled … to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event."

32. On or about January 4, 2022, Investor signed the SAFE and then received a fully executed agreement on which Rundle had forged Wealth Advisor's signature as "CEO" of Robinvest.

33. On January 13, 2022, the Robinvest bank account received a total of $1.5 million from Investor. These were the first funds received by this account, which had been opened on December 16, 2021.

C. <u>Rundle Misappropriated Investor's Funds</u>

34. Within three days of receiving the $1.5 million from Investor, Rundle transferred $980,000 of it to two accounts: (1) a business bank account in the name of ABR Consulting, LLC, which he created and controlled; and (2) a personal bank account.

35. From January 13, 2022 to February 23, 2022, Rundle transferred a total of $720,000 received from Investor to his personal bank account. Through June of 2022, Rundle then transferred the bulk of these funds in a series of transactions from his bank account to his personal Crypto trading account.

36. Rundle transferred a total of $779,500 to the ABR Consulting bank account. Approximately $200,000 was transferred to a CleverProfits bank account, $206,000 was used to repay loans incurred by CleverProfits, LLC, and another $21,000 was used to repay a loan and payroll expenses incurred by ABR Consulting. Approximately $88,900 was used to pay personal credit card debt. And $250,000 was used to set up a family trust in South Africa.

37. By June 1, 2022, the Robinvest bank account had a balance of $500.

38. Rundle never invested Investor's money as per the SAFE and Investment Prospectus, but instead used the money to, among other things, fund his personal Crypto trading account, pay off credit card debt, payroll expenses, repay business loans, and fund a family trust.

39. In December 2022, Rundle withdrew the remaining balance of his Crypto trading account, which by then was $73,113, and transferred it to his personal checking account.

D. Rundle Perpetuated the Scheme by Fabricating Account Statements and Denying Investor's Redemption Requests

40. Throughout 2022 and 2023, Rundle, posing as Wealth Advisor and using the email for Wealth Advisor he created and controlled, sent Investor false monthly account statements, showing fabricated profits and purportedly conservative growth.

41. For example, on November 28, 2022, Rundle, sent an email from the fabricated Wealth Advisor account he created and controlled which indicated that it attached the "final redemption statement." The statement purported to cover the period from January 13, 2022 to November 23, 2022, and showed 1.22% growth, as well as $18,286.19 in "Dividends Earned." This was all false because, in fact, the Fund did not exist, so none of the money was ever invested in it.

42. When Investor requested redemption of funds in November 2022 and January 2023, Rundle—again impersonating Wealth Advisor—denied the requests.

43. For example, on January 17, 2023, while posing as Wealth Advisor, Rundle denied Investor's redemption request via email (using the email for Wealth Advisor he created and controlled), and wrote, "The fund has withdrawn your early redemption request. We were issued with an instruction on Friday that all early redemptions have been canceled as the fund has been merged into another low-risk portfolio." The email noted that Investor's earliest date of redemption was January 13, 2024.

44. The January 17, 2023 email ended on a "positive note" by concluding that the fund had a "Month-to-Date return of 3.26%" and attached an account statement that showed 5.14% returns and $77,065.82 in dividends earned. All of this information was fabricated.

45. Investor continued to receive monthly statements from Rundle, and by December 31, 2023, her balance appeared to have grown to $1,622,003, an 8.13% return on her investment.

46. In reality, however, by June 2022, Rundle had misappropriated all but $500 of her investment and used it for his own benefit.

E. Rundle's Admissions

47. On June 16, 2023, Rundle emailed a trusted friend in the United States a document titled "Debt List – Adam Rundle.pdf." The Debt List attached to the email identified eight individuals and entities that were owed a total debt of $2,432,625.59. The list included a debt to Investor for $1,630,130.15, due January 13, 2024, and described as, "[t]his is the Robinvest deception I did (which implicated [Wealth Advisor])."

48. On July 31, 2023, Rundle admitted to former business partners that in January 2022 he had stolen money from a customer, used the funds to buy cryptocurrency, and lost all of the money.

49. The next day, Rundle followed up that conversation with a text message to his former business partners where he wrote:

> Hey guys, I am aware that there are some concerns around what I shared with you yesterday. I understand that completely. I will send a voice note later today explaining what I did and how it all happened.

50. Approximately an hour later, Rundle sent a voice note to these same individuals in which he admitted to being "selfish and greedy." He further stated that he copied an existing SAFE, misappropriated a licensed securities professional's identity, and sent a fabricated SAFE to Investor. He also admitted opening a bank account in the name of Robinvest to facilitate the Investor's investment in the fabricated Robinvest SAFE. Rundle further admitted that he,

> …took that money, that 1.5 million, and I then sent it to the Wolf Den, whatever they are called, Wolf Pack Crypto Fund, and was then waiting to, you know, decide when to liquidate that, and then move that money across. … And obviously, that did not materialize. The fund went south very quickly. I eventually liquidated the fund at $22,000.

51. Rundle continued to explain that,

> …the money was received in a, in, technically by a company called Robinvest, which is, you know, a company that I owned. That's the name that was used. And the agreement was signed between technically [Wealth Advisor] and [Investor],

> which was obviously a fake agreement which I forged, you know, I forged that agreement in order to get the money sent into Robinvest's account.

52. Rundle went on to note that one of the possible outcomes based on his conduct would be that Investor pursued a claim against him, and he would be, "charged with fraud and then prosecuted based on the fraud that I committed."

**DEFENDANT VIOLATED THE ANTIFRAUD PROVISIONS**

53. Defendant knew, or was reckless in not knowing, that he engaged in a scheme to defraud by creating Robinvest as a fictitious investment vehicle, fabricating an Investment Prospectus and SAFE, impersonating a licensed securities professional and his "assistant," and forging signatures to induce investment.

54. Defendant knew, or was reckless in not knowing, that the investment materials, including the SAFE and Investment Prospectus, contained false and misleading statements regarding Wealth Advisor's, as well as the Firm's, involvement with the investment, the existence of the Fund, and the guaranteed returns on the investment.

55. Rundle exercised authority and control over the misstatements (or misstatements misleading by omission) because he made the misstatements while he impersonated Wealth Advisor and "Sue Anderson," an imaginary assistant.

56. Rundle controlled Robinvest and directed the actions of Robinvest in the furtherance of the scheme to defraud investors.

57. The false and misleading statements were material as there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. These material misstatements described investment in a SAFE and a non-existent index fund, i.e., the Fund, which was described as a safe and conservative investment, and guaranteed that the investment would yield 4% returns. Had the Investor known that Rundle

was not going to invest in the conservative Fund, but instead was going to use the money to pay personal expenses and engage in risky Crypto trading, she would not have invested in Robinvest.

58. Rundle also engaged in deceptive conduct by fabricating account statements, to include false returns earned on the initial investment.

59. Rundle perpetrated his fraudulent scheme with a years-long course of conduct involving false records and accounts that gave the Investor the false impression that Robinvest was earning steady returns.

60. The Robinvest SAFE constitutes a "security" because it automatically converts to preferred stock (equity) in the event of "Equity Financing" and therefore falls within Securities Act § 2(a)(1).

61. Per the terms of the Investment Prospectus, the funds were to be invested in the Fund, an index fund based on the MSCI USA Index, and an index of securities constitutes a security under Securities Act § 2(a)(1).

62. The fraudulent conduct occurred in connection with the purchase and sale of Robinvest securities, and in the offer or sale of securities, since, among other things, the sale of the SAFE occurred after Rundle provided information, including the SAFE agreement and Investment Prospectus, that contained materially false and misleading statements.

63. Rundle acted with scienter. He acknowledged in June, July and August 2023 that he forged the SAFE and Investment Prospectus, impersonated Wealth Advisor, and diverted Investor's funds for personal use.

64. Defendant received money from the sale of the Robinvest SAFE as he transferred the money to his personal bank account, as well as a second business bank account, all of which he controlled. Rundle did not invest the funds as described in the Investment Prospectus, instead

converting the funds to his own use. Rundle used the misstatements to obtain money from the sale of the Robinvest SAFE to Investor.

## FIRST CLAIM FOR RELIEF
## Fraud in Violation of Section 17(a) of the Securities Act

65. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 64, inclusive, as if they were fully set forth herein.

66. By engaging in the conduct described above, Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails,

(a) knowingly or recklessly employed one or more devices, schemes or artifices to defraud;

(b) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) knowingly, recklessly, or negligently engaged in one or more transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

67. By reason of the foregoing, Defendant violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a) of the Securities Act [15U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
## Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

68. The Commission realleges and incorporates by reference each and every

allegation in paragraphs 1 through 64, inclusive, as if they were fully set forth herein.

69. Defendant directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly,

(a) employed one or more devices, schemes, or artifices to defraud;

(b) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

70. By reason of the foregoing, Defendant violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

I.

Permanently restraining and enjoining Defendant, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with any of them from violating, directly or indirectly, the federal securities laws alleged in this Complaint;

II.

Permanently restraining and enjoining Defendant from, directly or indirectly, acting or being associated with a broker, dealer, or investment adviser;

III.

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Section 21(d)(3) (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)].

IV.

Ordering Defendant to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

V.

Granting any other and further relief this Court may deem just and proper.

VI.

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Judson T. Mihok*

Judson T. Mihok
Gregory R. Bockin
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Phone: 267-216-8097
Fax: 215-597-2740
Email: mihokj@sec.gov